871 A.2d 575

**Andrew A. MOHAN**

v.

**Edward T. NORRIS, et al.**

**No. 88, Sept. Term, 2004.**

Court of Appeals of Maryland.

April 4, 2005.

Sandra J. Strebel, Patrick J. McAndrew (McAndrew, Zitver & McGrath, P.A., on brief), Greenbelt, for petitioner.

Betty A. Stemley, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

We issued a writ of certiorari in this case to consider whether a police officer, although unconditionally certified by the Maryland Police Training Commission ("MPTC"), nonetheless is denied the protections of the Law Enforcement Officer's Bill of Rights ("LEOBR") during that officer's initial probationary status as required by his or her employing police agency. For reasons to be explained, we conclude that such an officer, while in a probationary status with his or her police agency employer upon his or her initial hiring by that employer, is denied, as a result of that probationary status, the protections of the LEOBR, irrespective of his or her certification status with the MPTC.

## I.

In December 1997, Andrew A. Mohan graduated from the Prince George's County Police Municipal Academy and was hired as a police officer by the Town of Edmonston Police

Department. Before assuming duties with that department, Mohan was issued a provisional certification card by the Maryland Police Training Commission.[1] Mohan remained in this provisional status while an officer with the Town of Edmonston until September 1998, when he departed to join the Town of Cheverly Police Department. The MPTC issued Mohan a permanent certification card at this juncture.

On 7 January 2002, Mohan was hired by the Maryland Department of State Police ("State Police"), and received a permanent certification card from the MPTC for this new employment. Two days later, he signed an "Agreement" with the State Police outlining the terms of his employment, which included a 24 month probationary period.[2] The probationary period, according to the Agreement, would be in effect during Mohan's further training at the Maryland State Police Academy and would continue after his assumption of regular duties with the State Police.

During this probationary period, Mohan was served on 29 July 2003 with two documents, each entitled "Maryland State Police Probationary Trooper Record of Disciplinary Action," charging him with violating various rules, policies, and procedures of the State Police. The documents informed Mohan that, as a result of the alleged infractions, he would be suspended summarily for a total of 11 days. Mohan requested that he be given a hearing on the charges pursuant to the rights outlined in the LEOBR, codified at the time at Md.Code (1957, 1996 Repl.Vol., 2001 Supp.), Art. 27, §§ 727–734D (recodified, without substantive change, at Md.Code (2003), §§ 3–

---

1. The MPTC, initially established by the Legislature in 1966, serves principally a statewide training oversight function for virtually all Maryland State and local law enforcement officers.

2. As discussed *infra*, a statute establishes a two year probationary period for police employees of the State Police. Md.Code (1957, 1998 Repl.Vol.), Art. 88B, § 18 (recodified, without substantive change, at Md.Code (2003), § 2–403 of the Public Safety Article). Although the Agreement between Mohan and the State Police does not reference this statute, the probationary requirement in the Agreement reiterates the statutorily imposed probationary period.

101—3–113 of the Public Safety Article). His employer responded that the LEOBR excluded from its coverage probationary employees; therefore, Mohan was not entitled to its protections because, at the time of the alleged infractions, he was still a probationary employee of the State Police.

On 13 August 2003, Mohan filed in the Circuit Court for Prince George's County a complaint for an ex parte injunction and issuance of a show cause order against Colonel Edward T. Norris, then-Secretary of the Maryland State Police, and the Department. A show cause order was issued and an expedited hearing held. Through the efforts of the trial judge, an Assistant Attorney General representing Secretary Norris and the Department was notified and appeared for the hearing, though no written answer was filed. There appearing to be no dispute as to facts material to the case, the hearing proceeded upon oral argument of counsel on the question of law presented. The trial judge ruled from the bench that Mohan was a probationary employee, as defined by the State Police Act, Md.Code (1957, 1998 Repl.Vol.), Art. 88B, § 18 (recodified, without substantive change, at Md.Code (2003), § 2–403 of the Public Safety Article), and was therefore not entitled to the protections of the LEOBR. A confirming written order denying the injunctive relief was entered ultimately. The Court of Special Appeals affirmed the trial court's judgment. *Mohan v. Norris,* 158 Md.App. 45, 854 A.2d 259 (2004). Mohan petitioned this Court for a writ of certiorari, which we granted, 383 Md. 569, 861 A.2d 60 (2004), to consider the following question:

Did the Court of Special Appeals err in determining that a police officer, permanently certified by the Maryland Police Training Commission, may nonetheless be excluded from the protections of the Law Enforcement Officer's Bill of Rights due to the officer's probationary status as imposed by a hiring agency?

## II.

■ Mohan's question is one of statutory interpretation and, as such, is purely a matter of law. *Salamon v. Progres-*

*sive Classic Ins. Co.,* 379 Md. 301, 307, 841 A.2d 858, 862 (2004). Our standard of review, therefore, is *de novo. Id.; see also Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004) (stating that "[b]ecause our interpretation of . . . provisions of the Maryland Code . . . are appropriately classified as questions of law, we review the issues *de novo* to determine if the trial court was legally correct in its rulings on these matters").

## III.

Three statutory schemes are the foci of our analysis in this case. At the center of the controversy is the Law Enforcement Officer's Bill of Rights ("LEOBR"), codified at the time of the proceedings below at Md.Code (1957, 1996 Repl.Vol., 2001 Supp.), Art. 27, §§ 727–734D (recodified, without substantive change, at Md.Code (2003), §§ 3–101–3–113 of the Public Safety Article).[3] The LEOBR was enacted in 1974 as the nation's first comprehensive statutory scheme intended to provide certain procedural protections to "law enforcement officers," as that term is defined in the statute, during any investigation, charging, and subsequent hearing that could lead to disciplinary sanctions. *Baltimore City Police Dep't v. Andrew,* 318 Md. 3, 12, 566 A.2d 755, 759 (1989); *see also* Byron L. Warnken, *The Law Enforcement Officers' Privilege Against Compelled Self-Incrimination,* 16 U. Balt. L.Rev. 452, 489–98 (1987) (outlining the history and provisions of the LEOBR and chronicling the failed attempts in the U.S. Congress, prior to the enactment of the LEOBR in Maryland, to enact a national bill of rights for law enforcement officers). These procedural protections include, among others, the right to be informed in writing of the nature of an investigation prior to any interrogation, the right to reasonable limitations on the structure, time, and place of an interrogation, the right

---

3. Unless otherwise indicated, all subsequent citations to the provisions of the LEOBR shall refer to the Public Safety Article reference numbers.

to a complete written or transcribed record of any interrogation, the right to be notified of the name of any witness and all charges and specifications against the officer not less than ten days prior to any hearing, and the right to a copy of the investigatory file and any exculpatory information. § 3–104. If an investigation results in the recommendation of some disciplinary or punitive action against a law enforcement officer, the LEOBR, with limited exceptions, entitles an officer to a hearing before a hearing board composed of at least three other police officers. § 3–107. Procedures governing the hearing include the right to cross-examination and the power of the hearing board to compel the attendance of witnesses through subpoenas. *Id.* If, after a hearing and a finding of guilt, the hearing board determines that a disciplinary or punitive sanction is appropriate, the board makes recommendations to the chief of police of the appropriate police agency, who then must review the recommendations and issue a final order within 30 days. § 3–108. A final order may be appealed to the local circuit court and, thereafter, to the Court of Special Appeals. § 3–109. If a law enforcement officer is denied any of the rights afforded by the LEOBR, he or she may apply to a circuit court for an order directing the law enforcement agency to show cause why a right should not be granted.[4] § 3–105.

In 1977, the Legislature amended the LEOBR in order to deal with the relationship between it and other statutes providing alternative remedies for police officers facing disciplinary sanctions. 1977 Md. Laws, Chap. 366; *Moats v. City of Hagerstown,* 324 Md. 519, 526–27, 597 A.2d 972, 975–76 (1991). The new section provided:

> Except for the administrative hearing process provided for in [Article 41, § 4–201] concerning the certification enforcement power of the Police Training Commission,[5] the provi-

---

4.  Mohan relied on this provision in seeking relief in the Circuit Court.

5.  Because Mohan's appeal does not concern the validity of his MTPC certification status, this exception is not relevant to the resolution of this matter.

sions of this subtitle shall supercede any State, county or municipal law, ordinance, or regulation that conflicts with the provisions of this subtitle, and any local legislation shall be preempted by the subject and material of this subtitle. 1977 Md. Laws, Chap. 366 (as amended by 1981 Md. Laws, Chap. 679) (recodified, without substantive change, at § 3–102). The Court in *Moats* relied on this language to conclude that the LEOBR was a law enforcement officer's "exclusive remedy in matters of departmental discipline." 324 Md. at 530, 597 A.2d at 977.

This "exclusive remedy," however, may be invoked only by a "law enforcement officer," who, at the time of the LEOBR's enactment, satisfies the definition of "any person who, in his official capacity, is authorized by law to make arrests and who is a member of" any of a number of statutorily recognized police agencies, including the State Police. 1974 Md. Laws., Chap. 722 (codified, without substantive change, at § 3–101(e)). In 1975, the statute was amended to exclude expressly from the LEOBR's coverage "an officer serving in a probationary status." [6] 1975 Md. Laws, Chap. 809. That definition was further amended in 1977 to provide that the term "probationary status" would include "only an officer who is in that status upon initial entry into the Department." [7] 1977 Md. Laws, Chap. 366.

---

**6.** The full text of the pertinent portion of the 1975 amendment provides that " '[l]aw enforcement officer' does not include an officer serving in a probationary status except when allegations of brutality in the execution of his duties are made involving an officer who is in a probationary status." 1975 Md. Laws, Chap. 809. Although the exact nature of Mohan's alleged infractions is unclear from the record, he claimed at the Circuit Court hearing that the charges against him did not involve allegations of brutality.

**7.** Upon the recodification of the LEOBR, without substantive change, in 2003 into the Public Safety Article of the Maryland Code, the language of the exclusionary definitions was reformatted and slightly modified to read as follows:

(2) "Law enforcement officer" does not include: ...
(iv) an officer who is in probationary status on initial entry into the law enforcement agency except if an allegation of brutality in the execution of the officer's duties is made.

The Department of State Police was created by the Legislature in 1935 upon the enactment of the State Police Act ("SPA") (the second statute important to our analysis), and became a principal department of the Maryland State Government by virtue of an amendment to the SPA in 1994. 1935 Md. Laws, Chap. 303; 1994 Md. Laws, Chap. 165. At the time of the proceedings below, the SPA was codified at Md.Code (1957, 1998 Repl.Vol.), Art. 88B (recodified, without substantive change, at Md.Code (2003), §§ 2–101–2–703 of the Public Safety Article).[8] The SPA provides that the State Police "has the general duty to safeguard the lives and safety of all persons in the State, to protect property, and to assist in securing to all other persons the equal protection of the laws." § 2–301(a). The affairs and operations of the State Police are supervised and directed by a Secretary, who is appointed by, and reports to, the Governor. § 2–202. The Secretary also is granted authority to "adopt rules necessary to ... promote the effective and efficient performance of the duties of the [State Police] [and to] ensure the good government of the [State Police] and its employees."[9] § 2–205.

---

§ 3–101(e)(2)(iv).

The Revisor's Note states that "the reference to initial entry into the 'law enforcement agency' is substituted for the former reference to initial entry into the 'Department' because this provision is not limited to officers who are entering a particular police department, but covers officers entering any law enforcement agency listed in paragraph (1)(ii) of this subsection."

8.  Unless otherwise indicated, all subsequent citations to the provisions of the SPA shall refer to the Public Safety Article reference numbers.

9.  This authority expressly includes, among others, the following powers:

> (1) to "establish standards, qualifications, and prerequisites of character, training, education, and experience for employees of the [State Police]," § 2–204(b)(6);
> (2) to establish ranks and grades, and to "designate the authority, responsibility, and duties of [such ranks and grades]," §§ 2–204(b)(7)–(8);
> (3) to "appoint, promote, reduce in rank or civilian classification, reassign, reclassify, retire, and discharge any employee of the [State Police] in the manner required by law," § 2–204(b)(9);

Since its initial adoption in 1935, the SPA has imposed a probationary period on all State police employees,[10] commencing with the date of their appointment to the State Police. Md.Code (1935 Supp.), Art. 88B, § 10. Initially, the SPA provided for a probationary period of one year, during which the Superintendent (later Secretary) possessed authority to discharge police employees at his or her discretion. *Id.* In 1945, the probationary period was extended to two years. 1945 Md. Laws, Chap. 294.

Mohan's argument relies heavily on the provisions of the Maryland Police Training Commission Act ("MPTCA") (the third statutory scheme of significance to this case), codified at the time of his discipline at Md.Code (1957, 1997 Repl.Vol.), Art. 41, § 4–201 (recodified, without substantive change, at Md.Code (2003), §§ 3–201-3–218 of the Public Safety Article).[11] The MPTCA, originally enacted in 1966, establishes the Maryland Police Training Commission ("MPTC") as an agency within the Maryland State Department of Public Safety and Correctional Services. § 3–202. The MPTC has authority and powers over all aspects of police training, including establishing and certifying police training schools, and prescribing the curriculum, eligibility requirements, and standards of operations at such schools. § 3–207.

---

(4) to "regulate attendance, conduct, training, discipline, and procedure for employees of the [State Police]," § 2–204(b)(10); and
(5) to "provide systems for periodic evaluation and improvement of the performance and physical condition of employees...." § 2–204(b)(11).

10. The SPA distinguishes between "police employees" and "civilian employees." §§ 2–101(c), (i). The SPA defines "police employees" as those employees possessing "the same powers, privileges, immunities, and defenses as [those possessed by] sheriffs, constables, police officers, and other peace officers ... at common law and may now or in the future exercise within their respective jurisdictions." § 2–412(b). A "civilian employee" is defined as "an employee of the [State Police] other than a police employee." § 2–101(c).

11. Unless otherwise indicated, all subsequent citations to the provisions of the MPTCA shall refer to the Public Safety Article reference numbers.

The MPTC also possesses statutory authority to certify as police officers those individuals who "satisfactorily meet[ ] the standards of the [MPTC]" or an equivalent training program in another State. § 3–209. After an individual meets the MPTC's minimum standards, as set forth in the MPTCA and regulations promulgated pursuant to it, he or she becomes certified as a police officer and receives a "permanent appointment" from the MPTC. § 3–215(a)(2). Without a certification by the MPTC, a person is prohibited, with limited exceptions, from being employed as a police officer by the State, a county, or a municipality. § 3–216; *see Stanford v. Maryland Police Training and Corr. Comm'n,* 346 Md. 374, 390, 697 A.2d 424, 431–32 (1997) (holding that "termination of employment [with a police agency] invalidates an individual's certification as a police officer" under the MPTCA). The MPTC, however, also possesses the authority to grant a qualified individual a "probationary appointment" as a police officer for a period not to exceed one year "to enable the individual seeking permanent appointment to take a training course required by [the MPTCA]." § 3–215(c).

The meaning of "probationary appointment" for MPTC purposes is further defined in the regulations adopted by the MPTC pursuant to the MPTCA. These regulations define "probationary period" as "a period of a maximum of 365 days under [§ 3–215(c)], Annotated Code of Maryland: (i) During which a police officer with a provisional certification ... may perform [his or her] duties while obtaining the training specified in this chapter; and (ii) Which ends the earlier of 365 days or upon completion of mandated training." COMAR 12.04.01.01(13)(a). The regulations add that the term "probationary period" "does not relate to or restrict a probationary period that may be imposed by the hiring agency." *Id.* 12.04.01.01(13)(b).

The MPTCA also contains a preemption provision similar to that found in the LEOBR. Section 3–218 of the MTPCA states that "[t]his subtitle supercedes any law, ordinance, or regulation of the State, a county, or a municipal corporation that conflicts with this subtitle."

IV.

A.

■ Mohan contends that the Court of Special Appeals erred in determining that, although he held a "permanent appointment" from the MPTC, he was nonetheless "in probationary status" for purposes of the LEOBR because, at the time of charging and summary discipline in this case, he occupied the status of a probationary employee under the SPA. He claims that once an officer receives a "permanent appointment" from the MPTC, he or she no longer is "in probationary status" for purposes of the LEOBR. Support for his position is found, as the argument continues, in *Moore v. Town of Fairmount Heights*, 285 Md. 578, 403 A.2d 1252 (1979), in which this Court interpreted the term "probationary" as used in both the LEOBR and the MPTCA. Mohan argues that *Moore* settled, once and for all, that "probationary status," as used in the LEOBR, refers solely to the one year "probationary period" provided for in the MPTCA. We do not share his interpretation or agree with his application of that case.

1.

*Moore* concerned a police officer, Robert M. Moore, who first was hired by the Town of Fairmount Heights in May 1970. Although Moore was discharged by the Town in October 1974, he was reinstated in April 1976. In February 1978, Moore began a training course at the Prince George's County Police Academy, the completion of which was a prerequisite for certification by the MPTC. One month later, Moore was accused of cheating on an examination at the police academy and was informed that he would be dismissed from the academy as a result of the accusation. Moore withdrew from the academy. His employment with the Town of Fairmount Heights was terminated. After being denied by the Town a hearing under the LEOBR, Moore brought an action in the Circuit Court for Prince George's County and requested a show cause hearing as to why the Town should not be re-

quired to provide him with such a hearing. The Circuit Court held that, because Moore had not completed the training course required for permanent certification, he was precluded from attaining a non-probationary status under the MPTCA and thus was ineligible for the protections of the LEOBR.

In reviewing the Circuit Court's judgment, the Court of Appeals in *Moore* was called upon to interpret the meaning of the phrase "probationary status" in the LEOBR. Although the LEOBR did not define "probationary status," the Court found instructive the definition of "probationary period" found in the MPTCA, which provided for a probationary period of up to 365 days during which a person seeking a permanent appointment was to complete a police training course. *Id.* at 582–83, 403 A.2d at 1254–55. Moore argued that he could not be in a probationary status because he was never informed, by either his employer or the MPTC, that he was in a "probationary status" and that furthermore he had been employed by the Town as a police officer for more than 365 days. The Court, however, concluded that, no matter how long the length of service with a particular agency, the language of the MPTCA led to one conclusion: "one cannot *attain* permanent status (and thus, non-probationary status) until he has finished the training course [mandated by the MPTCA]." [12] *Id.* (construing §§ 3–215(b)–(c)) (emphasis in original).

### 2.

Mohan argues that the Court's reliance in *Moore* on the MPTCA definition precludes the application of any other definition of "probationary status" in his case. He points specifically to the following language in *Moore:*

> [T]he reasonable interpretation of the clause [in the LEOBR], that probationary status includes only an officer in that status upon initial entry into the Department, is that

---

**12.** The MPTCA was amended in 1981 to reflect the holding in *Moore.* 1981 Md. Laws, Chap. 679. This amendment provides that "[a] law enforcement agency may not employ an individual as a police officer for a period not exceeding 1 year unless the individual is certified by the [MPTC]." § 3–216.

it applies only to those who have once attained permanent status.

285 Md. at 585, 403 A.2d at 1256.

Because he obtained a permanent certification from the MPTC as a police officer in 1998, Mohan perceives that he is precluded from again being deemed "in probationary status" for purposes of the LEOBR. Mohan's interpretation of *Moore*, however, represents a strained reading.

In *Moore*, the Court was asked to determine how the "probationary period" found in the MPTCA was to be applied to the "probationary status" exclusion found in the LEOBR. Instead of linking the probationary provision in the LEOBR exclusively to the MPTCA, the language in *Moore* pointed to by Mohan merely represents the Court's conclusion that a police employee, in a "probationary period" under the MPTCA, remains thus upon his or her initial entry into a particular police department until that employee attains a permanent appointment from the MPTCA. *Moore* does not hold, contrary to Mohan's arguments, that a permanently certified police officer is precluded from being placed "in probationary status," within the meaning and purposes of the LEOBR, through the application of a probationary period imposed by a hiring agency. *Moore* sought simply to harmonize the two statutes, and thus analyzed only "probationary" as used in the MPTCA. Nowhere in *Moore* did we hold that the definition of "probationary" in the MPTCA was to be the exclusive definition or application of a probationary status for purposes of the LEOBR.[13]

3.

The Court in *Moore* also undertook to determine the meaning of the term "initial entry" as used in the LEOBR, in light

---

**13.** Mohan's application of *Moore* to his situation with the State Police is also highly problematic when one considers that *Moore*'s 1979 interpretation of the MPTCA did not consider that since 1945 the State Police, by act of the General Assembly, imposed a two year probationary period for new police employees. *Supra* at 9.

of the meaning of "probationary appointment" as used in the MPTCA. *Id.* at 585\*, 403 A.2d at 1256. Moore argued that because the definition of "probationary status" found in the LEOBR included "only an officer who is in that status upon initial entry into the Department," he was not a probationary police officer because he initially entered the Town's police department in 1970. The Court rejected that argument, reasoning that, although Moore's eight years of probationary status were "highly unusual," the Court was bound by the language in the MPTCA that clearly indicated a person could become an unconditional police officer only by completing the required training course. *Id.* Despite Moore's lengthy employment with the Town, the Court determined that his "initial entry" into the Town police department was when he was rehired in 1976. *Id.* The Court held that, at the time of his termination, Moore lacked the statutory qualifications for "permanent status," and thus, through the mere passage of time, could not "attain such status by something analogous to a prescriptive right." *Id.* The Court also rejected Moore's argument for the reason that the Legislature could not have intended to sanction a system in which "a probationary police officer could, with the cooperation of his employer, obtain permanent status by the simple expedient of leaving his employment and then being rehired." *Id.*

Mohan continues here by arguing that this aspect of *Moore* actually supports his position that once a person obtains a permanent certification as a police officer, he or she may no longer be considered an officer in a probationary status in his or her "initial entry into the Department." Mohan finds comfort in the following language in *Moore:*

> In other words, [the clause limiting "probationary status" to those in that status "upon initial entry into the Department"] would protect permanent officers who receive transfers or promotions, precluding giving them a probationary status in their new assignments.

*Id.*

Again, he misinterprets the sense of the Court's words. Although the Court recognized that the plain language of the

MPTCA and the LEOBR did not resolve all issues relating to Moore's status, the Court sought to interpret both statutes so as to give both full effect. *Id.* Construing both statutes harmoniously, the Court found that, for purposes of the MPTCA, any police officer who does not achieve permanent status would remain in his or her "initial entry" into a department, and therefore "in probationary status," until he or she achieves permanent status by meeting the relevant requirements of the MPTCA. *Id.* The Court concluded that, in light of this, once an officer attains permanent status, he or she is precluded from being placed "in probationary status" with regard to the MPTC upon a transfer or promotion within the same police agency. *Id.*

Mohan, however, construes this language as suggesting that the "initial entry" provision in the LEOBR contemplates that a police officer will be "in probationary status" at only one time during his or her entire law enforcement career, no matter how many successive employers there may be—that is, when that officer is hired by his or her first law enforcement agency. Although *Moore* certainly narrowed the definition of "initial entry" with respect to those officers already hired by a singular agency, nowhere did the Court indicate that a police officer holding a permanent certification by the MPTC may not be placed in a "probationary status" as a result of being newly hired by a different or subsequent police agency.[14]

---

14. Mohan offers no case authority, other than *Moore,* in support of his argument that the MPTCA dictates the sole definition of "probationary status" to be used in understanding the similar phrase used in the LEOBR. Nor does Mohan offer any case law that endorses his interpretation of *Moore.* We, however, found a few cases in which courts accepted that the LEOBR does not extend to police employees who are subject to a probationary period imposed by the hiring agency, independent of the probationary period imposed by the MPTCA. *See, e.g., Behan v. Gagliano,* 84 Md.App. 719, 721 n. 3, 581 A.2d 854, 855 n. 3 (1990) (finding that because "[a]ppellee had been a Baltimore County police officer for just under two years, ... [a]ppellee was on probationary status [under Baltimore County Code and regulations, and] therefore, he was not entitled to any of the administrative protections set forth in [the LEOBR]").

We conclude, therefore, that, even though he was permanently certified by the MPTC, Mohan was in his "initial entry" into the employment of the State Police in January 2002. Although Mohan's permanent status certainly prevented him from being placed again "in probationary status" for purposes of the MPTCA, such certification status was no barrier to being placed "in probationary status," for purposes of the LEOBR, by his new police employer.

### B.

Adopting Mohan's interpretation and application of *Moore* as limiting "probationary status" in the LEOBR to the maximum one year probation defined in the MPTCA would render the "probationary status" language in the SPA ineffective and superceded. Such a result is at the heart of Mohan's claim, as his argument apparently rests, in part, on his contention that the use of the term "probationary status" in the SPA is in conflict with the use of the same term in the LEOBR.

As this argument goes, any attempt to apply another definition of "probationary" for purposes of the LEOBR than that

---

Furthermore, in *Carroll v. Town of University Park*, 155 F.3d 558, 1998 WL 390617, at *1 (4th Cir.1998), the Court of Appeals for the Fourth Circuit considered the question of whether a town police department could extend the probationary period of a police officer, as imposed by the town ordinances. In determining that the town did not violate the officer's right to procedural due process in extending her probationary period and, during that period, terminating her employment without a hearing, the court engaged in the following analysis regarding potential application of the LEOBR:

> Carroll had no property interest in her continued employment [as a police officer] with the Town. Her employment agreement specifically provided that she was probationary and could be terminated at any time. The LEOBR, which provides procedural protections for law enforcement officers related to termination and disciplinary measures, by its express terms does not apply to probationary officers. Carroll began her employment with the Town on January 11, 1993, and her contract specifically provided that she would be on probationary status for one year. Accordingly, she was still on probationary status when the Town extended her initial probationary status by ninety days on January 3, 1994, and not within the protections of the LEOBR.

155 F.3d 558, 1998 WL 390617, at *2 (citations omitted).

appearing in the MPTCA would conflict with the MPTCA. Mohan relies on a section in the MPTCA stating that its provisions "supercede[ ] any law, ordinance, or regulation of the State, a county, or a municipal corporation that conflicts with this subtitle." § 3–218. He contends that this language precludes the application of the two year "probationary status" imposed by the SPA.

The preemption language of the MPTCA is not in play, however, for the simple reason that there is no conflict between the two statutes. Although the MPTCA and the SPA both contain references to "probationary" status, we do not agree that the probationary period found in the SPA conflicts in any way with the implementation of a MPTC-imposed probation.

The probationary periods found in the MPTCA and the SPA are imposed for different reasons, and are applied to differing, non-conflicting situations. The MPTCA was enacted in 1966 "in an effort by the legislature to improve the educational and clinical training of police officers," and concerns itself primarily with those police officers new to the profession. *Stanford,* 346 Md. at 381, 697 A.2d at 427. The MPTCA guarantees that all law enforcement officers who receive a permanent certification, no matter by which agency they are hired, receive a uniform minimum standard of certification and possess the skills and training necessary to execute common law enforcement functions properly. §§ 3–207, 3–209.

Unlike the minimum two year probation imposed by the SPA, the probationary period imposed by the MPTCA is not necessarily fixed in duration, except at the maximum. The MPTCA "probationary period" ends "the earlier of 365 days or upon completion of mandated training." § 3–215(c); COMAR 12.04.01.01(13)(a)(ii). This is a function of its distinct purpose, which is to provide a period during which a person may execute law enforcement functions while he or she receives the mandated training necessary to receive a permanent certification from the MPTC. § 3–215(c); *Stanford,* 346 Md. at 385, 697 A.2d at 429. This provisional certification

scheme allows police agencies to utilize new hires without having their entry into the force delayed until the completion of their training mandated by the MPTCA. Due to this underlying purpose, this "probationary period" ends when a probationary officer fulfills the mandatory training and receives a permanent appointment from the MPTCA.[15] § 3–215; COMAR 12.04.01.01(13)(a)(ii).

The probationary period imposed by the SPA, on the other hand, is imposed automatically by statute for two years, without regard to the prior experience, training, or background of the new hire. § 2–403. This probationary period, during which a probationary officer may be discharged or otherwise disciplined at the discretion of the Secretary of the State Police, does not fulfill solely a further training requirement, but rather gives effect to the authority and oversight that the SPA grants the Secretary over the State Police. §§ 2–204, 2–205.

With these distinct purposes in mind, we find that the two statutorily-imposed probationary periods do not conflict with one another, even if they may be applied concurrently to a particular police employee. Mohan's view that the probationary provision in the SPA overlapping or supplementing the MPTCA provision is preempted by the MPTCA and the LEOBR finds no support in the actual language of the statutes. We are unable to identify any language in either the LEOBR or the MPTCA that suggests that the MPTCA was intended as the only definition of "probation" that is applicable to § 3–101(e) of the LEOBR. Furthermore, there is no language in the LEOBR reflecting Mohan's interpretation of *Moore* that simply because a police officer completes his or her minimum training required by the MPTCA that officer is precluded from being placed in a probationary status upon his

---

15. The training-oriented purpose of the MPTCA-imposed "probationary period" further is buttressed by the fact that if a probationary police officer does not complete the prescribed training course within 365 days of the beginning of his or her employment with a particular police agency, that officer is prohibited by the MPTCA from continuing his or her employment with that agency. § 3–216.

or her initial entry into a subsequent police agency or department.

■ Had the Legislature desired to limit the term "in probationary status" solely to the definition found in the MPTCA, it easily could have done so. It, however, did not include such a limitation. In seeking a disposition of the present case in his favor, Mohan essentially asks us to add language to the LEOBR that is not there. The language of the LEOBR expressly excludes from the application of the statute those officers "in probationary status." We therefore abide by this language and conclude that a police officer placed "in probationary status" by his or her employer is also "in probationary status" as that phrase is used in the LEOBR. Thus, the LEOBR's protections are unavailable.

## C.

The available and relevant legislative history supports our view that the Legislature contemplated the application of the SPA-imposed "probationary status" to the LEOBR.[16]  In 1968,

---

**16.**  In his brief, Mohan argues that "[h]ad the legislature disagreed with the Court's conclusion in *Moore v. Town of Fairmount Heights* that 'probationary' in the LEOBR has the same meaning as does that term in the MPTCA, it had an opportunity to clarify the meaning of 'probationary' in [an] amendment to the LEOBR provision." Petitioner's Brief at 18.

The assumption underlying Mohan's argument is, of course, that he correctly characterizes our holding in *Moore*. We believe the Legislature's inaction in this regard was because *Moore*, despite Mohan's claims, did not take a position either way on the applicability of the probationary language in the SPA to the LEOBR. Although the Legislature amended the MPTCA within two years in apparent response to the *Moore* holding, this amendment acted to clarify the perceived ambiguities and conflicts highlighted by the Court between the LEOBR and the MPTCA by providing that "[a] person may not be employed as a police officer by any law enforcement unit for a period to exceed 12 months unless that person is certified [as a police officer] by the [MPTC]." 1981 Md. Laws, Chap. 679. This language directly addressed the analysis engaged in by the Court in *Moore* involving its interpretation of the term "initial entry" in the LEOBR. This amendment ensured that any police officer that did not complete the training course mandated by the MPTCA within a year could not be employed as a police officer, eliminating the possibility of a reoccurrence of the

the language of the SPA was amended, among other reasons, for the purpose of "provid[ing] for the qualifications, manner of appointment, probationary status, compensation, promotion, suspension, demotion, and termination of employment of employees of the [State Police]." 1968 Md. Laws, Chap. 547. The relevant provision regarding probationary State Police employees was rewritten [17] to state:

> All police employees, including persons appointed to the [State Police] for training prior to regular assignment as a police employee, shall remain *in a probationary status* for a period of two years from the date of appointment to the [State Police]. . . . The Superintendent [later Secretary] may discharge an employee in *probationary status* for any cause which he, in his sole discretion, deems sufficient.

*Id.* (codified, without substantive change, at the time of the proceedings below, at Md.Code (1957, 1998 Repl.Vol.), Art. 88B, § 18) (recodified, without substantive change, at § 2–403) (emphasis added). This language regarding the "probationary status" of new appointees to the State Police was in effect when the Legislature amended the LEOBR in 1975 to exclude from its coverage probationary officers. The provision that was added to the LEOBR contained the following language:

> "Law enforcement officer" does not include an officer serving *in a probationary status* except when allegations of brutality in the execution of his duties are made involving an officer who is *in a probationary status.*

---

circumstances present in *Moore.* The Legislature, however, apparently saw no need to amend or clarify the "probationary status" language in the LEOBR (or the MPTCA) to implicate officers that were covered by a particular agency's definition of "probation" because the holding in *Moore* simply did not extend to officers, such as Mohan, who were placed in a probationary status by a new agency under provisions other than the MPTCA.

17. The previous language, originally enacted in 1935, was as follows:
   All of the police employees appointed to the Department [of State Police] shall be probationer, and on probation for a period of one year from the date of appointment.
   Md.Code (1935 Supp.), Art. 88B, § 10, as enacted by 1935 Md. Laws, Chap. 303.

1975 Md. Laws, Chap. 809 (codified, without substantive change, at the time of the lower proceedings at Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 727(c)) (recodified, without substantive change, at § 3–101(e)(2)(iv)) (emphasis added).

When the LEOBR was enacted initially, and indeed when it was amended in 1975 to exclude police officers "in a probationary status," the Legislature implicitly was aware that the SPA imposed a two year "probationary status" on new State Police troopers. We believe that it is no coincidence that the Legislature used the exact language found in the SPA, "in a probationary status," to describe the class of police officers that it intended to exclude from the coverage of the LEOBR.[18] This similarity leads us to but one conclusion—that the LEOBR, as amended in 1975, excluded from its coverage not only those police officers who are placed in a probationary period by the MPTCA, but also those officers such that are "in probationary status" as imposed by the SPA.

This conclusion becomes even clearer when one examines the regulations promulgated by the MPTC pursuant to the MPTCA. § 3–208. It is a well established rule of statutory construction that, in determining the meaning of a statute, we give some deference to the interpretation of the agency, in this case the MPTC, charged with the administration of a statute. *Stanford,* 346 Md. at 389, 697 A.2d at 431. We find in the MPTC regulations, first adopted in 1997, language that supports the notion that the MPTCA merely provides a non-exclusive definition of probation. 24:17 Md. Reg. 1215 (1997). COMAR 12.04.01.01(13)(b) states:

> (b) "Probationary period" does not relate to or restrict a probationary period that may be imposed by the hiring agency.

This language is a clear statement by the MPTC that it does not construe the MPTCA probationary provisions to conflict

---

18. We note also that, upon recodification of the SPA and LEOBR in 2003 into the Public Safety Article, the phrase, "in a probationary status," was changed in both statutes to "in probationary status." § 2–403; § 3–101(e)(2)(iv).

with, or supercede, probationary provisions of greater duration, such as that in the SPA, imposed by a hiring agency.

In the years since this regulation was adopted, there have been several amendments to the MPTCA. None of these amendments, however, contradict the MPTC's regulatory interpretation of the MPTCA's non-exclusive probationary provision, an interpretation that is inconsistent with the position advocated by Mohan. We note that "[l]egislative acquiescence in the Commission's treatment [of the nonexclusivity of the MPTCA's definition of probation] is yet further confirmation that the General Assembly intends the same result." *Stanford,* 346 Md. at 390, 697 A.2d at 431.

## D.

Mohan maintains, however, that applying the SPA "probationary status" provision to the LEOBR will yield results inconsistent with the purpose of the LEOBR. Mohan fairly observes that the LEOBR is a remedial statute and, as such, should be "liberally construed to effectuate the statute's remedial purpose." Petitioner's Brief at 10; *Caffrey v. Dept. of Liquor Control,* 370 Md. 272, 306, 805 A.2d 268, 288 (2002); *see Moats,* 324 Md. at 530, 597 A.2d at 977 (describing the LEOBR as a "comprehensive remedial scheme"). Nonetheless, in *Baltimore City Police Department v. Andrew,* 318 Md. 3, 566 A.2d 755 (1989), we described the legislative purpose behind the LEOBR:

> In enacting the LEOBR, the legislature sought to guarantee specified procedural safeguards to *certain* law enforcement officers subject to investigations that might lead to disciplinary actions. *Any law enforcement officer covered by the LEOBR* is entitled to the protections it offers with respect to a departmental inquiry that could lead to disciplinary sanctions.

*Id.* at 12, 566 A.2d at 759 (citations omitted) (emphasis added).

Although its status as a remedial statute compels us to construe liberally the LEOBR in a way designed to give full effect to its purpose, we are restricted by the boundaries

established by the language of the statute itself. *See Price v. State*, 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003) (stating that "[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application"). The procedural protections granted by the LEOBR are conferred on members of specified police agencies, but denied to those police officers "in probationary status." § 3-101(e)(2)(iv). In construing a statute to give its full protections to the class or classes of persons it was intended to protect, we necessarily inquire as to who the statute was designed to protect. We need not consider, however, the proper way to construe the LEOBR with respect to Mohan because, as our analysis here indicates, the LEOBR expressly excludes from its coverage law enforcement officers, such as Mohan, who have been placed in a probationary status by a police agency upon their initial entry into that department. *Id.*

Mohan ripostes, however, that allowing individual agencies to impose their own probationary periods for purposes of the LEOBR would be inconsistent with the purpose of the LEOBR because it would lead to a lack of uniformity in the application of the LEOBR throughout the many law enforcement agencies in the State. Were that allowed, Mohan claims that it would be possible for a police officer, permanently certified by the MPTC, to change police agencies so often that he or she would spend his or her entire, peripatetic law *enforcement career* without ever being covered by the LEOBR. This interpretation, Mohan argues, is inconsistent with the Legislature's intent because it would lead to a chilling effect on the ability of law enforcement agencies to attract experienced police officers.

Although one of the underlying purposes of the LEOBR is to provide a uniform system of police discipline throughout the State, *Moats*, 324 Md. at 528, 597 A.2d at 976, we may not overlook, in determining the scope of its coverage, all of the language of the statute. By excluding from coverage police

officers "in probationary status," the LEOBR appears to reflect a legislative decision to provide each individual police agency with the authority to prescribe its own probationary period during which that particular police agency has the autonomy to impose disciplinary sanctions, including dismissal, without implicating the protections of the LEOBR. *See* § 3–102(c) (stating that the LEOBR "does not limit the authority of the chief to regulate the competent and efficient operation and management of a law enforcement agency by any reasonable means including transfer and reassignment if . . . that action is not punitive in nature [and where] the chief determines that action to be in the best interests of the internal management of the law enforcement agency"). Mohan's interpretation of *Moore*, that the LEOBR precludes MPTC-permanently certified police officers from being placed in a "probationary status" by any subsequent employer, however, interferes with this autonomy granted by the statute to the particular police agencies.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.